Gerald ROBINSON *v.* Karen FORD-ROBINSON

04-1235 208 S.W.3d 140

Supreme Court of Arkansas
Opinion delivered May 5, 2005

234

*Richard Worsham*, for appellant.

*Robert D. Willis, Jr.*, for appellee.

JIM GUNTER, Justice. This appeal raises the issue of whether, in a divorce proceeding, a circuit court may award visitation to a stepparent when the natural parent objects. We hold that a circuit court may award visitation to a stepparent standing *in loco parentis* over the natural parent's objection, and we affirm the circuit court's decision.

Gerald Robinson and Karen Ford-Robinson began living together in August 1997, married on January 28, 2000, separated on May 7, 2003, and divorced on November 4, 2003. During that time, Gerald had sole custody of his son, Austin, who was less than two years old when Karen moved in with them. Austin's biological mother relinquished her parental rights in a New York divorce action, and has had no contact with Austin since he was eight months old.

In Karen's initial complaint for divorce, she alleged that Gerald was not a fit and proper person to have custody of Austin and asked that she be awarded custody. In her second amended complaint, she did not ask for custody, but instead asked that she be awarded visitation with Austin. The circuit court granted full custody to Gerald and limited visitation to Karen, finding that Karen had stood *in loco parentis* to Austin since he was eighteen months old, that he recognized her as his mother, and that it would be in Austin's best interest to have visitation with Karen. Gerald filed a motion for reconsideration, which was deemed denied.

He then filed an appeal with the Arkansas Court of Appeals, arguing that the cases relied upon by the circuit court as authority to grant visitation[1] have been overturned by *Troxel v. Granville*, 530 U.S. 57 (2000), and *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002). He argued alternatively that, if they have not been overturned, Karen failed to meet the standard of proof set forth in *Stamps v. Rawlins*. The court of appeals disagreed and affirmed the circuit court's decision. *Robinson v. Ford-Robinson*, 88 Ark. App. 151, 196 S.W.3d 503 (2004). Gerald petitioned this court for review of the court of appeals' decision, and we granted

---

[1] *Stamps v. Rawlins*, 297 Ark. 370, 761 S.W.2d 933 (1988) (holding that a stepparent may be awarded custody of a minor child, although the law recognizes a preference for a fit natural parent); *Golden v. Golden*, 57 Ark. App. 143, 942 S.W.2d 282 (1997) (court affirmed award of visitation to stepfather standing *in loco parentis* over objection of natural mother).

the petition. When this court grants a petition for review of a decision by the court of appeals, we review the appeal as thought it had originally been filed in this court. *Hollandsworth v. Knyzewski*, 353 Ark. 470, 109 S.W.3d 653 (2003).

■ We review domestic-relations cases *de novo* on the record, but will not reverse a trial court's findings of fact unless they are clearly erroneous. *Id.*; *Medlin v. Weiss*, 356 Ark. 588, 158 S.W.3d 140 (2004). A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Medlin, supra.* Finally, we give due deference to the superior position of the trial court to view and judge the credibility of the witnesses. This deference is even greater in cases involving child custody, as a heavier burden is placed on the trial judge to utilize to the fullest extent his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Hunt v. Perry*, 355 Ark. 303, 138 S.W.3d 656 (2003); *Hamilton v. Barrett*, 337 Ark. 460, 989 S.W.2d 520 (1999).

Our *de novo* review of the record reveals the following. Gerald described Karen's relationship with Austin as one of "buddies." He testified that he and Karen discussed her adoption of Austin, but he told her it was not an option because Austin already had a biological mother. He admitted that he had described Karen as Austin's mother both in conversations and in writing over the years. He also acknowledged that he had executed powers of attorney for Karen so that she could get medical care for Austin when he was away, although he suggested that this was not unusual because he was in the military.

He testified that he objected to Karen having any contact with Austin after the divorce for several reasons. First, Karen told Gerald that one of the reasons she wanted a divorce was that she was a nanny, not a wife or mother. Second, since she left, Austin has not asked to spend any time with her and has never cried for her. Finally, Karen was seeing someone; although Gerald admitted he was also seeing someone with whom he had a sexual relationship. He felt that visitation with Karen would confuse Austin in the event Gerald remarried and introduced a new "mother" into Austin's life.

Karen described herself at trial as Austin's mother. She testified that she entered Austin's life when he was approximately

eighteen months old, that she had been his mother for the last seven years, and that she loved him as if she were his mother. She said that Austin has called her Mommy since he was just over two years old, and did not know that she was not his birth mother until he was in first grade. She described Austin as a very sweet, lovable child. She testified that she went to all of his games, parent-teacher conferences, and school functions. She said that she wanted visitation because she loved Austin and felt it would be in his best interest for them to continue their relationship. While she admitted that it might be confusing to Austin to end up having several mothers, she thought that it would be more confusing and damaging to him to sever the relationship because she was the only mother Austin had ever known.

Karen's mother testified that Karen and Austin had a very close relationship and that Karen was his mother in every sense of the word. She also stated that Austin referred to Karen as Mommy very early in their relationship. She believed Austin would benefit from visitation with Karen.

The assistant director of the after-school-care facility attended by Austin testified that she did not even know Karen was Austin's stepmother until Karen brought cookies to Austin after she and Gerald divorced. She testified that Austin was not enthused to see her. Serena Dempsey, who had been babysitting for Austin once or twice a month since the divorce, testified that she had not seen Austin cry because he missed his mother and that when she asked him if he missed his mother, Austin said "no, not really." Gerald's mother testified that Austin was worried about his daddy being by himself and did not understand why his mother was "doing this" to his daddy.

Gerald's claim on appeal is that the circuit court erred in awarding visitation with Austin to Karen. His first argument supporting this claim is that *Stamps* — one of the cases upon which the circuit court relied for authority to grant visitation to a stepparent — was overturned by the United States Supreme Court's decision in *Troxel v. Granville*, 530 U.S. 57 (2000), and our decision in *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002). We reject this argument.

In *Troxel*, a plurality of the United States Supreme Court held that the State of Washington's grandparent-visitation statute was unconstitutional as applied in that case due in large measure to its "breathtakingly broad" scope allowing "any person" to peti-

tion for visitation "at any time." 530 U.S. at 67. The central problem with the statute, according to the plurality, was that it failed to accord a fit parent's decision "any presumption of validity or any weight whatsoever." *Id.* The Court recognized the presumption that a fit parent acts in the best interest of his or her child. 530 U.S. at 68. In light of this presumption, the Court held that a court that reviews a fit parent's decision regarding grandparent visitation "must accord at least some special weight to the parent's own determination," but did not elaborate on the nature or extent of that "weight." 530 U.S. at 70. Because of the breadth of the Washington statute allowing any person to petition for visitation at any time, and the application of that statute by the trial court in failing to accord any special weight to the parent's determination of her daughters' best interests, a plurality of the Court held that the statute, as applied, violated the Due Process Clause of the Fourteenth Amendment. The Court expressly declined, however, to "define . . . the precise scope of the parental due process right in the visitation context[,]" noting

> that the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied and that the constitutional protections in this area are best "elaborated with care." *Post*, at 2079 (dissenting opinion). Because much state-court adjudication in this context occurs on a case-by-case basis, we would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a *per se* matter.

530 U.S. at 73.

In *Linder*, we reviewed the constitutionality of Arkansas's grandparent-visitation statute in light of *Troxel*, and held that it was unconstitutional as applied. Like the Washington statute reviewed in *Troxel*, our statute did not give any presumptive or special weight to the parent's decision that grandparent visitation was not in the best interest of her child. Indeed, the statute's requirement that the court issue written findings when denying visitation, but not when granting visitation, effectively placed the burden of proof on the parent, in direct contravention of *Troxel*. Because the trial court had already determined that the mother in *Linder* was a fit parent — for all purposes except determining visitation — we held that the Fourteenth Amendment right of Due Process attached and special weight should have been accorded to her decision.

■ In response to Gerald's argument, we hold that neither *Troxel* nor *Linder* overturns our ruling in *Stamps, supra.* In *Stamps,* we held that a stepparent could be awarded custody of a minor child, though we held it was not appropriate in that case. We restated the caselaw preference for natural parents in custody matters, and held that the preference must prevail unless it is established that the natural parent is unfit. *Id.* First, *Troxel* and *Linder* involved statutory visitation with grandparents rather than custody by stepparents. Moreover, the preference in *Stamps* is precisely what the courts in *Troxel* and *Linder* found lacking. That is, the central problem in *Troxel* and *Linder* was that the statutes at issue failed to accord a fit parent's decision "any presumption of validity or any weight whatsoever." 530 U.S. at 67. In *Stamps,* this court clearly accorded a fit parent's decision special weight, holding that a court must grant custody to the natural parent over a stepparent unless the natural parent is proven to be unfit. However, while *Stamps* certainly indicates that a court has authority to award visitation to a stepparent, we do not find that the natural-parent presumption in *Stamps* governs this case, as this case involves visitation by a stepparent, rather than custody.

■ Moreover, neither *Troxel* nor *Linder* precludes the visitation awarded by the circuit court in this case. The facts in the present case are distinguishable from those in both *Troxel* and *Linder.* First, the visitation rights in this case arose out of a custody determination in a divorce proceeding rather than from a lawsuit brought by nonparents pursuant to a statute. Visitation was incident to and part of the circuit court's determination of custody. Moreover, and critical to our review in this case, the party awarded visitation in this case was found by the circuit court to stand *in loco parentis* to the child. In other words, the court granted visitation to a person it considered to be, in all practical respects, a non-custodial parent.

■ In *Standridge v. Standridge,* 304 Ark. 364, 803 S.W.2d 496 (1991), we cited Black's Law Dictionary (5th ed. 1979) defining *"in loco parentis"* as "in place of a parent; instead of a parent; charged factitiously with a parent's rights, duties, and responsibilities." In *Moon Distributors v. White,* 245 Ark. 627, 434 S.W.2d 56 (1968), we permitted a wrongful-death award to a decedent's stepdaughter to whom the decedent stood *in loco parentis,* noting that the stepdaughter lived in the home with her

stepmother "as mother and daughter." Finally, this court has treated grandparents who stood *in loco parentis* differently from grandparents who did not. *See Johnson v. Tompkins*, 341 Ark. 949, 20 S.W.3d 385 (2000). In *Johnson*, we held that the grandparents had no right to present evidence on whether adoption would be in their grandchild's best interest. *Id.* We distinguished our decisions in *Quarles v. French*, 272 Ark. 51, 611 S.W.2d 757 (1981), and *Cox v. Stayton*, 273 Ark. 298, 619 S.W.2d 617 (1981), in which we held that grandparents had standing to intervene in adoption proceedings involving their grandchildren, because the grandparents in those cases stood *in loco parentis* to their grandchildren. We hold that a court may award visitation to a stepparent who stands *in loco parentis* to a minor child when it determines that it is in the best interest of the child.

 Finally, Gerald argues that if *Stamps* was not overturned by *Troxel* and *Linder*, the circuit court erred in holding that Karen stood *in loco parentis* to Austin. In this case, Karen was the only mother Austin had ever known, and Austin did not know she was not his birth mother until first grade. She had served as Austin's mother for six years. Karen described herself as Austin's mother; Austin called her Mommy. The fact that she told Gerald one of the reasons she left was because she was a nanny, rather than a wife or mother, appears from her testimony to have had more to do with her impression of her relationship with Gerald than with Austin. After a *de novo* review, we hold that the circuit court's finding that Karen stood *in loco parentis* to Austin was not clearly erroneous.

Affirmed.

Glaze, J., dissents.

Tom Glaze, Justice, dissenting. The majority opinion makes an attempt to distinguish our case in *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002), from the instant case. In doing so, this court relies heavily on our decision in *Stamps v. Rawlings*, 297 Ark. 370, 761 S.W.2d 933 (1988), and a court of appeals case, *Golden v. Golden*, 57 Ark. App. 143, 942 S.W.2s 282 (1997). Both of these cases preceded *Linder* and *Troxel v. Granville*, 530 U.S. 57 (2000), but the majority court relies on them as holdings that recognize a preference for a fit natural parent, but also would allow a stepparent custody or visitation rights, if the judge believes the best interests of the child warrant such custody or visitation.

In *Stamps*, this court held that a trial judge may award custody of a child to a stepparent, but our case law establishes a preference for natural parents, and that preference must prevail unless the natural parent is unfit. The *Stamps* court concluded the preference is based on the child's best interests, and in recognizing the natural parent was found fit, this court ruled that custody of the child should have been left with his mother, not placed with his stepfather.

At this point, it is significant to mention that the majority opinion relies on most of what the *Stamps* case holds, but then (confounding to me) it seeks to distance itself from *Stamps* by stating that it did not find that natural-parent presumption (preference?) governs this case, as this case involves visitation by a stepparent, rather than custody.

The majority court seems to overlook the fact that our court in *Linder* fully adopted the Supreme Court's plurality opinion and the Court's rationale in *Troxel*. The language employed by *Troxel*, and by our court in *Linder*, is much stronger in favoring a fit parent than that found in our prior case law where a parent's custody and visitation rights were in issue when a grandparent, stepparent, or other third party sought the custody or visitation of a child.

Unlike our prior Arkansas case law, our court in *Linder* began its review with the analysis that Lea Ann Linder, a single parent, had a fundamental right under the Fourteenth Amendment in *prohibiting state intrusion* on her parenting of her son. The *Linder* court, quoting Justice O'Conner favorably, stated: "Impingement on a parent's fundamental liberty right to raise children requires heightened review and that one 'special factor' that might warrant state interference was if the parent were declared unfit." Put another way, if a parent is unfit, then clearly, under this approach, the state intrusion with the relationship is warranted.

The *Linder* case involved grandparents' visitation rights given them with their grandson by the trial court, even though the boy's mother, Lea Ann, was declared fit. Lea Ann successfully reversed the lower court's award of visitation rights to the grandparents, but this court upheld Arkansas' Grandparent Visitation Act (GPVA) as facially constitutional, but concluded the act had been erroneously applied by the trial court. *See* Ark. Code Ann. § 9-13-101 (Repl. 2002); now Ark. Code Ann. § 9-13-1031 (Supp. 2003).

It appears to me that, by this court's decision in *Freeman v. Rushton*, 360 Ark. 445, _____ S.W.3d _____ (January 27, 2005),[1] and its decision here today, our court is giving no real discussion or guidance regarding the *Linder* and *Troxel* holdings, and, instead, glosses over the constitutional, fundamental right a fit parent has concerning his or her child's care, custody, and control. So long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children. To hold otherwise, if a judge disagrees with the parents' estimation of the child's best interests, the judge's view necessarily prevails. Thus, in practical effect, a court can disregard and overturn *any* decision by a fit, custodial parent concerning visitation whenever, as noted above, the third party affected by the decision files a visitation petition, based solely on the judge's determination of the child's best interests.

For these reasons, I respectfully dissent.

---

[1] In fact, this court in *Freeman* failed to even mention the *Troxel* or *Linder* decisions, even though the issue was whether the circuit court had erred by granting custody to the child's maternal grandparents instead of the child's biological father, who was fit. On appeal, this court affirmed the trial court.